| | |
|---|---|
| **Richard Ebison,**<br><br>                              Plaintiff,<br><br>v.<br><br>**Carolyn Colvin**, Acting Commissioner of Social Security,<br><br>                              Defendant. | **Memorandum & Recommendation** |

Plaintiff Richard Ebison instituted this action on August 1, 2014, to challenge the denial of his application for social security income. Ebison claims that Administrative Law Judge Catherine Harper erred in finding that his impairments did not meet or equal a listing impairment, in determining that he had the residual functional capacity ("RFC") to perform a limited range of light work, and in weighing the opinions of his treating physicians. Both Ebison and Defendant Carolyn Colvin, the Acting Commissioner of Social Security, have filed motions seeking a judgment in their favor. D.E. 29, 35.

After reviewing the parties' arguments, the court has determined that ALJ Harper reached the appropriate decision. ALJ Harper properly concluded that Ebison did not meet or equal the criteria contained in listing 1.04 and properly evaluated the medical opinion evidence. Additionally, substantial evidence supports ALJ Harper's finding that Ebison could perform light work with additional limitations. Therefore, the undersigned magistrate judge recommends[1] that

---

[1] The court has referred this matter to the undersigned for entry of a Memorandum and Recommendation. 28 U.S.C. § 636(b).

Ebison's Motion for Judgment on the Pleadings be denied, that Colvin's Motion for Judgment on the Pleadings be granted, and that the Commissioner's final decision be affirmed.

I.  **Background**

On July 3, 2012, Ebison filed applications for disability insurance benefits and supplemental security income on the basis of a disability that allegedly began on February 1, 2009. After his claims were denied at both the initial stage and upon reconsideration, Ebison appeared before ALJ Harper via video-conference for a hearing on April 2, 2014. ALJ Harper determined that Ebison was not entitled to benefits because he was not disabled. Tr. at 12–24.

In her decision, ALJ Harper found that Ebison had the following severe impairments: degenerative disc disease of the lumbar spine, status post lumbar fusion in April 2007, and obesity. *Id.* at 14. ALJ Harper found that his impairments, alone or in combination, did not meet or equal a listing impairment. *Id.* at 16. ALJ Harper determined that Ebison had the RFC to perform light work with the following limitations: he should never climb ropes, ladders, or scaffolds; he can occasionally climb ramps and stairs and can occasionally stoop; he can frequently balance, kneel, crouch, and crawl; he can occasionally reach overhead with both arms; and he should avoid concentrated exposure to unprotected heights and to excessive vibrations. *Id.* at 17. ALJ Harper concluded that Ebison was capable of performing his past work as a meter reader. *Id.* at 22. ALJ Harper also found that, considering Ebison's age, education, work experience, and RFC, there were jobs that existed in significant numbers in the national economy that he was capable of performing. *Id.* These jobs included: ticket taker, mail clerk, and marker. *Id.* at 23. Thus, ALJ Harper found that Ebison was not disabled. *Id.* After unsuccessfully seeking review by the Appeals Council, Ebison commenced this action and filed a complaint pursuant to 42 U.S.C. § 405(g) on August 1, 2014. D.E. 6.

II.  Analysis

   A.  Standard for Review of the Acting Commissioner's Final Decision

When a social security claimant appeals a final decision of the Commissioner, the district court's review is limited to the determination of whether, based on the entire administrative record, there is substantial evidence to support the Commissioner's findings. 42 U.S.C. § 405(g); *Richardson v. Perales*, 402 U.S. 389, 401 (1971). Substantial evidence is defined as "evidence which a reasoning mind would accept as sufficient to support a particular conclusion." *Shively v. Heckler*, 739 F.2d 987, 989 (4th Cir. 1984) (quoting *Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966)). If the Commissioner's decision is supported by such evidence, it must be affirmed. *Smith v. Chater*, 99 F.3d 635, 638 (4th Cir. 1996).

   B.  Standard for Evaluating Disability

In making a disability determination, the ALJ engages in a five-step evaluation process. 20 C.F.R. § 404.1520; *see Johnson v. Barnhart*, 434 F.3d 650 (4th Cir. 2005). The analysis requires the ALJ to consider the following enumerated factors sequentially. At step one, if the claimant is currently engaged in substantial gainful activity, the claim is denied. At step two, the claim is denied if the claimant does not have a severe impairment or combination of impairments significantly limiting him or her from performing basic work activities. At step three, the claimant's impairment is compared to those in the Listing of Impairments. *See* 20 C.F.R. Part 404, Subpart P, App. 1. If the impairment is listed in the Listing of Impairments or if it is equivalent to a listed impairment, disability is conclusively presumed. However, if the claimant's impairment does not meet or equal a listed impairment then, at step four, the claimant's RFC is assessed to determine whether plaintiff can perform his past work despite his impairments. If the claimant cannot perform past relevant work, the analysis moves on to step five: establishing

3

whether the claimant, based on his age, work experience, and RFC can perform other substantial gainful work. The burden of proof is on the claimant for the first four steps of this inquiry, but shifts to the Commissioner at the fifth step. *Pass v. Chater*, 65 F.3d 1200, 1203 (4th Cir. 1995).

### C. Medical evidence

Ebison's medical history includes a back injury he sustained while working as a patient transporter in 2006. Tr. at 18. After lumbar fusion surgery in April 2007, Ebison returned to light duty work. *Id.* at 232–50. Treatment notes from his primary care providers indicate that Ebison reported low back pain with occasional neck, foot, and shoulder pain. *Id.* at 423. The medical record also indicated that he failed to follow up with vocational rehabilitation as advised in June 2010. *Id.* In March 2011, Ebison had full 5 on a 5 point scale after a test for muscle strength in his upper extremities and he reported that he walked for exercise. *Id.* at 423–25. In May 2011, Ebison reported that he felt his conditions improved with Cymbalta and Fentanyl patches. *Id.* at 417–21. Records reflect that he had normal range of motion ("ROM") in his neck and full strength in all extremities. *Id.*

At a follow up appointment in August 2011, Ebison reported pain. *Id.* at 386–91. Treatment records noted mid thoracic pain, 4/5 muscle strength, and negative Tinel's (nerve damage) and Phalen's (carpal tunnel) tests. *Id.* An August 2011 follow up again demonstrated negative Tinel's and Phalen's tests. *Id.* at 384–86. X-rays of the thoracic spine showed good anatomic alignment with no significant arthritis. *Id.* at 384. An x-ray of the cervical spine was unremarkable. *Id.* Ebison received Neurontin and Fentanyl patches. *Id.*

Ebison complained of neck and shoulder pain in January 2012. *Id.* at 37–83. Upon examination, he had diminished sensation in his lower extremities. *Id.* Ebison presented to the Emergency Department in February 2012 complaining of chronic back pain. *Id.* at 493–98.

4

Examination revealed normal ROM in his neck and back as well as full strength in all extremities. *Id.* At a March 2012 follow up visit with his physician, Ebison had no complaints of pain. *Id.* at 374–77. Subsequent nerve conduction studies revealed some decreased sensation with evidence of old L5 radiculopathy with no active process. *Id.* at 489–92. Ebison was referred for pain management. *Id.* An April 2012 follow-up noted that Ebison had no reports of pain, had 4/5 muscle strength in his arms, and he had negative Phalen's and Tinel's tests. *Id.* at 623–27.

Ebison saw pain specialist Dr. Ann Nunez in April 2012. *Id.* at 623–27. Ebison stated that he walked without assistance, exercised, stretched, and drove. *Id.* Examination revealed full 5/5 muscle strength, decreased ROM in shoulders and spine, and negative straight leg raises. *Id.* Dr. Nunez diagnosed chronic low back pain for which she prescribed Fentanyl patches, Ultram, and stretching exercises. *Id.* At a May 2012 follow-up appointment, Ebison stated that the medication helped his pain and that he continued to exercise. *Id.* at 482–88. In September 2012, Ebison reported that he continued to walk and stretch and stated that medication, hot showers, and the TENS unit helped his pain. *Id.* at 688–72. On June 8, 2012, Dr. Nunez completed a Medical Source Statement opining that Ebison could lift and carry 20 pounds occasionally and ten pounds frequently, he could stand for two hours in an eight hour day, he would be required to alternate between sitting and standing, he could not kneel, crouch or stoop, and he could occasionally reach. *Id.* at 1014–17.

On July 30, 2012, Ebison had a psychological consultative exam with Ted Jamison, M.A. *Id.* at 527–30. He reported sleepiness as a medication side effect and depression due to back pain. *Id.* Jamison concluded that Ebison was capable of sustaining attention and completing simple tasks and found that he appeared able to understand instructions. *Id.* at 529. Jamison

5

concluded that there was no mental health reason preventing Ebison's gainful employment. *Id.* at 530.

State agency psychologist Ken Wilson submitted a psychiatric review technique form dated September 4, 2012. *Id.* at 82–83. He determined that Ebison had no limitations in activities of daily living, mild limitations with both social functioning and maintaining concentration, mild limitations in persistence and pace, and no episodes of decompensation. *Id.* Dr. Wilson noted that his findings were consistent with those of Jamison as well as with the prior ALJ determination which found Ebison had no mental impairments, was doing well on medication, and denied symptoms of depression. *Id.* Upon reconsideration on March 4, 2014, Ben Williams, Ph.D., noted similar findings. *Id.* at 112–15.

Ebison again saw Dr. Nunez in October 2012 when he reported his pain medication relieved his pain but made him drowsy. *Id.* at 673–74. Dr. Nunez referred Ebison for physical therapy, which was noted to be going well. *Id.* at 707–13. Physical therapy notes indicate that Ebison reported he was unable to walk short distances, but that he drove, was independent with personal care, did not use an assistive device to ambulate, and carried a medium-sized backpack on his shoulder. *Id.* at 674–76. Examination revealed decreased ROM and some tenderness to palpitation in the mid-thoracic area. *Id.* He was encouraged to increase his activities. *Id.* at 678–70.

Ebison followed-up with his primary care physician in December 2012 complaining of back pain and headaches. *Id.* at 701–05. Examination indicated essentially normal findings and he was given a Toradol injection. *Id.* X-rays of the mid-thoracic spine revealed slight degenerative changes. *Id.* at 749. A lumbar MRI showed a slight disc bulge without significant effect or evidence of compression when compared to a 2006 MRI. *Id.* at 750. In January 2013,

6

Ebison sought treatment for myofascial pain, status post lumbar fusion, and chronic low back pain. *Id.* at 800–11.

In January 2013, Ebison reported that his pain was well-controlled with medication and his examination showed only mild findings. *Id.* at 752–58. A February 2013 Medical Source Statement by Dr. Geniene Jones opined that he had low back syndrome, some weakness in the upper extremities, and decreased mobility in his head. *Id.* at 812. The provider opined that these conditions might last one year. *Id.* Ebison went to the Emergency Department the same day complaining of back pain. *Id.* at 880–82. Examination noted normal findings. *Id.* He returned to the Emergency Department a few days later with reports of pain, but examination findings were again normal. *Id.* at 857–79.

On March 4, 2013, Dr. Melvin Clayton conducted an RFC and, based on the medical evidence, the prior ALJ finding, and Ebison's statements of his activities of daily living, concluded he was capable of light work with limitations. *Id.* at 115–20. Ebison returned to the Emergency Department later that month complaining of pain in his neck and back and stating that he had run out of medication. *Id.* at 820–56. Examination and diagnostic tests were normal, although it noted mild degenerative changes in the spine. *Id.* Ebison thereafter followed-up with his primary care physician and had good results from an injection. *Id.* at 1006–08.

In May 2013, Ebison had a neurological consultation with Connie Cerne, PA-C. *Id.* at 1006–08. Examination showed full motor strength, full ROM in his extremities and limited ROM in his spine, negative straight leg raises, and mild tenderness to palpitation of the lumbar spine. *Id.* An MRI of his lumbar spine was unremarkable. *Id.* Ebison reported his pain was a 10 on a 10 point scale in both June 2013 and July 2013, but he had no signs of distress and examination findings were normal. *Id.* at 813–18. He was advised to be active. *Id.* Records from

October 2013 note that Ebison complained of burning, stabbing pain radiating down his leg. *Id.* at 903–07. Examination found no apparent distress, no tenderness, and normal strength and sensation. *Id.* In February 2014, Ebison again presented to the Emergency Department complaining of low back pain and reporting that he had run out of medication. *Id.* at 912–18. Records state that he had a slightly tender low back and a slight decrease in ROM, but that his examination was otherwise normal and he was able to lay down, sit, stand, and bend without assistance. *Id.* at 916.

### D. Listing 1.04

Ebison first argues that ALJ Harper erred by failing to find that his impairments met listing 1.04. The Commissioner contends that ALJ Harper correctly determined that he failed to establish all the criteria for this listing. The undersigned determines that the ALJ did not err in deciding that Ebison failed to establish all the criteria under listing 1.04.

The listings describe impairments, organized into sections corresponding to major body systems, that are deemed sufficiently severe to prevent a person from doing any gainful activity. 20 C.F.R. §§ 404.1525(a), 416.925(a). If a claimant's impairments meet a listing, that fact alone establishes that the claimant is disabled. *Id.* §§ 404.1520(d), 416.920(d). An impairment meets a listing if it satisfies all the specified medical criteria. *Sullivan v. Zebley*, 493 U.S. 521, 530 (1990); Social Security Ruling ("S.S.R.") 83–19, 1983 WL 31248, at *2 (1983). The burden of demonstrating that an impairment meets a listing rests on the claimant. *Hall v. Harris*, 658 F.2d 260, 264 (4th Cir. 1981).

Even if an impairment does not meet the listing criteria, it can still be deemed to satisfy the listing and the claimant thereby deemed to be disabled if the impairment medically equals the criteria. 20 C.F.R. §§ 404.1520(d), 404.1525(c)(5), 416.920(d), 416 .925(c)(5). To establish such

8

medical equivalence, a claimant must present medical findings equal in severity to all the criteria for that listing. *Sullivan*, 493 U.S. at 531; 20 C.F.R. §§ 404.1526(a), 416.926(a) (medical findings must be at least equal in severity and duration to the listed criteria). "A claimant cannot qualify for benefits under the 'equivalence' step by showing that the overall functional impact of his unlisted impairment or combination of impairments is as severe as that of a listed impairment." *Sullivan*, 493 U.S. at 531.

The relevant listing, 1.04, provides:

Listing 1.04 Disorders of the spine (e.g., herniated nucleus pulposus, spinal arachnoiditis, spinal stenosis, osteoarthritis, degenerative disc disease, facet arthritis, vertebral fracture), resulting in compromise of a nerve root (including the cauda equina) or the spinal cord. With:

A. Evidence of nerve root compression characterized by neuro-anatomic distribution of pain, limitation of motion of the spine, motor loss (atrophy with associated muscle weakness or muscle weakness) accompanied by sensory or reflex loss and, if there is involvement of the lower back, positive straight-leg raising test (sitting and supine)[.]

OR

B. Spinal arachnoiditis, confirmed by an operative note or pathology report of tissue biopsy, or by appropriate medically acceptable imaging, manifested by severe burning or painful dysesthesia, resulting in the need for changes in position or posture more than once every 2 hours;

OR

C. Lumbar spinal stenosis resulting in pseudoclaudication, established by findings on appropriate medically acceptable imaging, manifested by chronic nonradicular pain and weakness, and resulting in inability to ambulate effectively, as defined in 1.00B2b.

20 C.F.R. Part 404, Subpart P, App. I, § 1.04. In her decision, ALJ Harper stated that "neither [Ebison] not the representative argues that [he] has an impairment or combination of impairments that meets or equals the criteria of any listed impairment" and that she "specifically considered listing 1.04." Tr. at 16. Ebison asserts that a clamant can meet this listing with "a

9

diagnosis of degenerative disc disease accompanied by evidence of nerve root compression characterized by limitation of motion of the spine accompanied by a positive straight leg test or lumbar spinal stenosis manifested by chronic pain and weakness resulting in an inability to ambulate effectively." D.E. 30 at 10.

In support of his argument, Ebison notes that he has degenerative disc disease of the cervical and lumbar spines and that he suffers from myofascial pain syndrome with trigger points in his thoracic and lumbar spines following his lumbar fusion surgery. Ebison also point to a December 2012 MRI which showed L4-5 facet and ligamentous hypertrophy and a slight disc bulge. In February 2013, Dr. Jones found that Ebison had low back syndrome following discectomy and vertebral fusion at L5-S1. Dr. Jones reported that Ebison had developed thoracic and cervical radicular symptoms causing weakness and numbness in his upper extremities and that he had decreased mobility in his head due to shooting pain in his head and neck. Ebison also cites his his multiple complaints of pain, often described as a 10 on a 10 point scale, and Dr. Nunez's finding that he had chronic low back pain. Given this evidence, Ebison argues he has met or equaled the criteria of listing 1.04.

ALJ Harper correctly concluded that Ebison does not meet or equal listing 1.04. Although Ebsion cites criteria 1.04,[2] he fails to cite all the criteria required to meet these listings. As the Commissioner points out, listing 1.04 requires nerve root compression, spinal arachnoiditis, or lumbar spinal stenosis. However, Ebison has not identified the presence of these conditions in the record. The medical evidence noted: Ebison had the full range of motion; he could sit and stand normally; he had essentially full strength; he had intact motor strength, tone, and sensation; he had generally negative straight leg raises and he at times reported no pain, and

---

[2] Ebison does not specify under which subsection of listing 1.04 he qualifies.

reported some relief with medications and injections. Additionally, a lumbar spine MRI revealed normal alignment with only slight degenerative changes without significant effect and no evidence of compression. Similarly, x-rays of his lumbar spine showed no acute or destructive processes, x-rays of his thoracic spine showed good alignment without significant arthritis, and x-rays of his cervical spine were unremarkable.

In sum, the evidence fails to demonstrate the presence of all the required criteria. Ebison has not shown nerve root compression characterized by neuro-anatomic distribution of pain (1.04A), spinal arachnoiditis, confirmed by an operative note or pathology report of tissue biopsy, or by appropriate medically acceptable imaging, manifested by severe burning or painful dysesthesia (1.04B), or lumbar spinal stenosis resulting in pseudoclaudication, established by findings on appropriate medically acceptable imaging (1.04C). Nor has Ebison identified medical findings equal in severity to these criteria so as to establish medical equivalence. Accordingly, he has failed to carry his burden of establishing that he meets or equals listing 1.04.

Moreover, to the extent Ebison is required to demonstrate qualify an "inability to ambulate effectively" to qualify under this listing, such a showing has not been made.[3] An inability to ambulate effectively is generally defined as "having insufficient lower extremity functioning to permit independent ambulation without the use of a hand-held assistive device(s) that limits the functioning of both upper extremities." 20 C.F.R. Part 404, Subpart P, App. I, § 1.00(2)(b)(1). The medical evidence noted that Ebison used no assistive devices to ambulate. Tr.

---

[3] Listing 1.04 falls under the Section 1.00 (Musculoskeletal System), which notes "functional loss for purposes of these listings is defined as the inability to ambulate effectively on a sustained basis for any reason, including pain associated with the underlying musculoskeletal impairment[.]"

11

at 674–76. Notes also reflect that, at times, he ambulated well with a normal gait. *Id.* at 623–27; 674–76. Accordingly, he has not demonstrated an inability to ambulate effectively.

Finally, although ALJ Harper's consideration of listing 1.04 was brief, remand is not required. Generally, "[t]he ALJ is only required to explicitly identify and discuss relevant listings of impairments where there is ample evidence in the record to support a determination that an impairment meets or medically equals a listing." *Kelly v. Astrue*, 5:08–CV–289–FL, 2009 WL 1346241 *5 (E.D.N.C. May 12, 2009) (internal quotations omitted); *see Cook v. Heckler*, 783 F.2d 1168, 1172, 1173 (4th Cir. 1986) (holding that where "there is ample evidence in the record to support a determination that [plaintiff's condition] met or equalled" one of the listings, the ALJ is required to "explain the reasons for the determination that [plaintiff's condition] did not meet or equal a listed impairment"). The Court of Appeals has determined that remand is appropriate where the ALJ "provided no explanation other than writing that he 'considered, in particular,' a variety of listings." *Radford v. Colvin*, 734 F.3d 288, 295 (4th Cir. 2013). Here, in concluding that Ebison did not have an impairment or combination of impairments that met or equaled a listing impairment, ALJ Harper found that she "specifically considered listing 1.04" but said no more about it. Tr. at 16. In contrast to *Radford*, where there was probative evidence strongly suggesting that the claimant met or equaled listing 1.04A, in this case, there is no such probative evidence suggesting that Ebison meets or equals listing 1.04. Accordingly, ALJ Harper was not required to engage in a full explanation of this listing and her lack of discussion does not warrant remand.

Having failed to demonstrate entitlement to relief at step three, Ebison's argument on this issue should be rejected.

### E. Residual Functional Capacity

Ebison also asserts that ALJ Harper erred in determining that he could perform light work with additional limitations. Specifically, he claims that his treating physicians, Drs. Nunez and Jones, opined that he had functional limitations below the threshold for light duty work. The Commissioner submits that substantial evidence supports this conclusion.

An individual's RFC is defined as the capacity which an individual possesses despite the limitations caused by his or her physical or mental impairments. 20 C.F.R. § 416.945(a)(1); S.S.R. 96–8p, 1996 WL 374184, at *1 (July 2, 1996). The RFC assessment is based on all the relevant medical and other evidence in the record and may include a claimant's own description of limitations arising from alleged symptoms. 20 C.F.R. § 416.945(a)(3); S.S.R. 96–8p, 1996 WL 374184, at *5. When a claimant has a number of impairments, including those deemed not severe, the ALJ must consider their cumulative effect in making a disability determination. 42 U.S.C. § 423(d)(2)(B); *see Hines v. Bowen*, 872 F.2d 56, 59 (4th Cir. 1989) (citations omitted) ("[I]n determining whether an individual's impairments are of sufficient severity to prohibit basic work related activities, an ALJ must consider the combined effect of a claimant's impairments."). Sufficient consideration of the combined effects of a claimant's impairments is shown when each is separately discussed by the ALJ and the ALJ also discusses a claimant's complaints and activities. *See Baldwin v. Barnhart*, 444 F. Supp. 2d 457, 465 (E.D.N.C. 2005). The RFC assessment "must include a discussion of why reported symptom-related functional limitations and restrictions can or cannot reasonably be accepted as consistent with the medical and other evidence." S.S.R. 96–8p, 1996 WL 374184, at *7.

In support of his argument, Ebison contends that the limitations associated with his impairments are objectively verified and that ALJ Harper had an obligation to account for them.

He points out that Dr. Nunez's Medical Source Statement found he could lift or carry 20 pounds occasionally and 10 pounds frequently; could stand or walk two hours in an eight hour workday; would require a sit/stand option; could occasionally reach; and could not kneel, crouch, or stoop. Additionally, Ebison points to Dr. Jones's February 6, 2013 finding that he was unable to work because of low back syndrome, thoracic and lumbar radicular symptoms, and decreased mobility of his head. Dr. Jones opined that these conditions and symptoms may last throughout his lifetime. He also argues that his testimony, which stated that he could only sit and stand for 10 minutes and walk for five minutes, supports a finding that he is unable to work because of chronic pain. Tr. 45–46.

As discussed in her decision, ALJ Harper determined that Dr. Nunez's opinions were due less weight. Tr. at 21. ALJ Harper noted that while Dr. Nunez's restriction on lifting and carry was supported by her clinical findings, her restrictions on Ebison's ability to walk, stand, and sit were inconsistent with her clinical findings of a normal gait and generally normal strength in his lower extremities. *Id.* Some weight was given to Dr. Nunez's opinion that Ebison likely has somatic dysfunction due to the fusion of the right sacroiliac for which she referred him to a chiropractor. *Id.* ALJ Harper gave less weight to Dr. Jones's opinion that Ebison was disabled, as this is an issue reserved to the Commissioner. *Id.* Such explanation is sufficient reasoning to allow the court to conduct a meaningful review. *See Smith v. Colvin*, 5:12–CV–311–FL, 2014 WL 25573 *8 (E.D.N.C. Jan. 2, 2014) (holding that level of detail provided in ALJ is adequate "as long as there is sufficient development of the record and explanation of the findings to permit meaningful review"). *See also Reid v. Commissioner of Social Security*, 769 F.3d 861, 865 (4th Cir. 2014); *Dyer v. Barnhart*, 395 F.3d 1206, 1211 (11th Cir. 2005) (explaining there "is no rigid requirement that the ALJ specifically refer to every piece of evidence in his decision"); *Doyle v.*

14

*Colvin*, No. 7:12–CV–326–FL, 2014 WL 269027, at *10 (E.D.N.C. Jan. 2, 2014), *adopted,* 2014 WL 269027, at *1 (Jan. 23, 2014).

Moreover, both the objective medical evidence and Ebison's statements regarding his activities of daily living are inconsistent with the findings of Drs. Nunez and Jones. Although Ebison alleged severe back pain, the medical record noted a lack of routine follow-up care. Additionally, Ebison continued to work light duty following his injury, he was advised to be active, he was observed to carry a medium-sized backpack on his shoulder, and he was smiling and had no signs of distress despite contemporaneous allegations of pain rated as a 10 on a 10 point scale. Moreover, his treatment has been largely conservative, consisting of short term physical therapy, pain medication, and use of a TENS unit. Ebison reported to providers that pain medication and stretching helped his back pain, both of which suggest his impairments were not disabling. *See*, *e.g.*, *Gross v. Heckler*, 785 F.2d 1163, 1166 (4th Cir. 1986) ("If a symptom can be reasonably controlled by medication or treatment, it is not disabling."). Additionally, imaging studies revealed only mild or minimal findings and an April 2013 neurological consultation was essentially normal. ALJ Harper also pointed to Ebison's wide range of activities of daily living— shopping, driving, cooking, cleaning, performing household chores, attending church and socializing—as evidence that he was not fully credible regarding his limitations. Finally, a Functional Capacity Evaluation ("FCE") in 2008 concluded that Ebison's statements of pain suggested symptom exaggeration and concluded he was capable of light work. Tr. at 18. Similarly, Dr. Clayton opined that Ebison could perform light work.

In sum, this evidence is inconsistent with the assessed limitations of both Drs. Nunez and Jones, as well as Ebison's own statements of the limiting effects of his conditions. Moreover, Dr. Clayton's assessment concluding that Ebsion was capable of light work constitutes substantial

15

evidence supporting ALJ Harper's RFC determination. Accordingly, Ebison has failed to demonstrate relief is warranted on this issue.

### F. Medical opinion evidence

Ebison next argues that ALJ Harper failed to give sufficient weight to the opinions of his treating physicians, Drs. Nunez and Jones. He maintains that these opinions deserve controlling weight. The Commissioner maintains that ALJ Harper properly considered the medical opinion evidence. The undersigned determines that the ALJ properly explained the weight assigned and her reasoning.

Regardless of the source, the ALJ must evaluate every medical opinion received. 20 C.F.R. § 404.1527(c). When evaluating medical opinions, the ALJ should consider "(1) whether the physician has examined the applicant, (2) the treatment relationship between the physician and the applicant, (3) the supportability of the physician's opinion, (4) the consistency of the opinion with the record, and (5) whether the physician is a specialist." *Johnson*, 434 F.3d at 654. An ALJ's determination as to the weight to be assigned to a medical opinion generally will not be disturbed absent some indication that the ALJ has dredged up "specious inconsistencies," *Scivally v. Sullivan*, 966 F.2d 1070, 1077 (7th Cir. 1992), or has failed to give a sufficient reason for the weight afforded a particular opinion, *see* 20 C.F.R. § 404.1527(d) (1998).

According to 20 C.F.R. §§ 404.1527(d)(2) & 416.927(d)(2), a treating source's opinion on issues of the nature and severity of the impairments will be given controlling weight when well supported by medically acceptable clinical and laboratory diagnostic techniques and when the opinion is consistent with the other substantial evidence in the record. Conversely, however, "the ALJ holds the discretion to give less weight to the testimony of a treating physician in the face of persuasive contrary evidence." *Mastro v. Apfel*, 270 F.3d 171, 178 (4th Cir. 2001); *see*

16

*also Craig*, 76 F.3d at 590 (finding that "if a physician's opinion in not supported by clinical evidence or if it is inconsistent with other substantial evidence, it should be accorded significantly less weight"). A medical expert's opinion as to whether one is disabled is not dispositive; opinions as to disability are reserved for the ALJ and for the ALJ alone. *See* 20 C.F.R. § 404.1527(e)(1) (1998). Generally, the more the medical source presents relevant evidence to support his opinion, and the better that he explains it, the more weight his opinion is given. *See* 20 C.F.R. § 404.1527(d)(3) (1998). Additionally, the more consistent the opinion is with the record as a whole, the more weight the ALJ will give to it. *See* 20 C.F.R. § 404.1527(d)(4) (1998).

Ebison asserts that ALJ Harper erred in giving less weight to the opinions of treating physicians Drs. Nunez and Jones and instead giving more weight to the findings of State agency consultants who did not examine him. Because the findings of Drs. Nunez and Jones are well-supported and because these providers have a treatment relationship with Ebison as his treating physician and treating neurologist, he argues that these opinions deserve more weight.

As noted above, ALJ Harper also gave less weight to Dr. Nunez's findings, noting that her two hour limitation for walking and standing was inconsistent with her medical examination notes indicating normal gait and generally normal strength of Ebison's lower extremities. Tr. at 21. Moreover, the record reflected essentially normal examinations, the evidence noted on several occasions that Ebison was doing well overall, and he reported relief from pain management treatments. In light of this persuasive, contrary evidence, ALJ Harper appropriately accorded Dr. Nunez's findings less weight.

Additionally, Dr. Jones opined that Ebison was disabled, a finding entitled to no special weight because it is a determination reserved to the Commissioner. 20 C.F.R. § 404.1527(e)(1)

17

(1998). Dr. Jones also opined that Ebison had developed symptoms in his upper extremities and as well as decreased mobility in his neck. Tr. at 812. These symptoms were not supported by her treatment notes or by objective medical evidence and instead appear to rely generalized statements of his condition.

ALJ Harper gave great weight to the Dr. Clayton's finding that Ebison could perform light work with additional restrictions that were reflected in the RFC determination. ALJ Harper noted that his findings were consistent with the record as a whole, including Ebison's conservative treatment history and the generally stable clinical findings. Tr. at 20. An ALJ may rely on the findings of a non-examining physician when they are consistent with the record. *Smith v. Schweiker*, 795 F.2d 343, 345 (4th Cir. 1986). *See Tanner v. Comm'r of Social Security*, 602 F. App'x 95, 101 (4th Cir. 2015) (affirming ALJ's assignment of great weight to state agency consultants where they were supported by the record as a whole); *Lusk v. Astrue*, No. 11–196, 2013 WL 498797, at *4 (W.D.N.C. Feb. 11, 2013) (expert opinions of agency reviewing physicians may amount to substantial evidence where they represent a reasonable reading of the relevant medical evidence) (citations omitted)

In weighing the medical opinion evidence, ALJ Harper properly explained the weight assigned and her reasoning. Although Ebison may disagree with the determinations made by ALJ Harper in weighing the medical opinions, the role of the court is not to re-weigh conflicting evidence or substitute its judgment for that of the Commissioner. *Craig*, 76 F.3d at 589; *see also Shively v. Heckler*, 739 F.2d 987, 989 (4th Cir. 1984). For these reasons, Ebison has failed to demonstrate that ALJ Harper erred in evaluating the medical opinions.

**III. Conclusion**

For the forgoing reasons, the court recommends that Ebison's Motion for Judgment on the Pleadings be denied, that Colvin's Motion for Judgment on the Pleadings be granted, and that the Commissioner's final decision be affirmed.

Furthermore, the court directs that the Clerk of Court serve a copy of this Memorandum and Recommendation on each of the parties or, if represented, their counsel. Each party shall have until 14 days after service of the Memorandum and Recommendation on the party to file written objections to the Memorandum and Recommendation. The presiding district judge must conduct his or her own review (that is, make a *de novo* determination) of those portions of the Memorandum and Recommendation to which objection is properly made and may accept, reject, or modify the determinations in the Memorandum and Recommendation; receive further evidence; or return the matter to the magistrate judge with instructions. *See, e.g.*, 28 U.S.C. § 636(b)(l); Fed. R. Civ. P. 72(b)(3); Local Civ. R. 1.1 (permitting modification of deadlines specified in local rules), 72.4(b), E.D.N.C.

**If a party does not file written objections to the Memorandum and Recommendation by the foregoing deadline, the party will be giving up the right to review of the Memorandum and Recommendation by the presiding district judge as described above, and the presiding district judge may enter an order or judgment based on the Memorandum and Recommendation without such review. In addition, the party's failure to file written objections by the foregoing deadline will bar the party from appealing to the Court of Appeals from an order or judgment of the presiding district judge based on the**

**Memorandum and Recommendation.** *See Wright v. Collins*, 766 F.2d 841, 846-47 (4th Cir. 1985).

Dated: August 12, 2015.

_____
ROBERT T. NUMBERS, II
UNITED STATES MAGISTRATE JUDGE